# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KIMBERLY J. SWAN, | § |
| | § |
| *Plaintiff*, | § |
| | § |
| versus | § CIVIL ACTION NO. 7:14-773 |
| | § |
| CAROLYN W. COLVIN, | § |
| Acting Commissioner of | § |
| Social Security, | § |
| | § |
| *Defendant*. | § |

## REPORT AND RECOMMENDATION

Kimberly J. Swan ("Swan") seeks review of an adverse decision on her application for supplemental security income. *See* 42 U.S.C. § 1382c(a)(3).[1]

### I. Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g).

---

[1] Supplemental Security Income provides an additional resource to assure that disabled individuals' incomes do not fall below the poverty line. Applicants seeking benefits under this statutory provision must prove "disability" within the meaning of the Social Security Act, which defines disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *See* 42 U.S.C. § 1382c(a)(3)(A).

Courts cannot retry factual issues *de novo* or substitute their interpretations of administrative records for the Commissioner's when substantial evidence supports the Commissioner's decision. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). Neither can they overturn the Commissioner's administrative rulings because they would have reached different conclusions had the matters come before them in the first instance. *See Campbell v. Astrue*, 465 Fed. App'x 4, 5 (2d Cir. 2012) (summary order). [2]

Congress directs reviewing courts also to take "due account" of "the rule of prejudicial error." 5 U.S.C. § 706; *see also* 28 U.S.C. § 2111 (directing that judgments given upon examination of records be "without regard to errors or defects which do not affect the substantial rights of the parties"); *see also* FED. R. CIV. P. 61 (stating that "the court must disregard all errors and defects that do not affect any party's substantial rights").

## II. Background

Swan, born in 1968, attended regular education classes, and graduated from high school. (T. 619). In 1995, she had a daughter. (T. 295).

In 1998, Swan worked as a security guard for an unknown amount of time; in 2000, she worked for only one or two months as a stock clerk; in 2003, she worked as a laborer counting cans for four to five months. (T. 139). She stopped working in August, 2003, allegedly due to "lots of pain, soreness . . . lifting and carrying things bothers [her] knees, back, neck and everything." (T. 138).

---

[2] A reviewing court's role must be viewed as narrow, with considerable deference to the Commissioner's fact-finding. *See Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (the substantial evidence standard is "a very deferential standard of review–even more so that the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable fact-finder would *have to conclude otherwise*") (emphasis in original) (internal citations omitted).

In her mid-twenties, Swan began to experience a variety of medical abnormalities. She sought and obtained medical treatment for abnormalcies in her knees, shoulders, neck, back and wrist. She was treated regularly for other maladies consisting of ongoing headaches with nausea, photophobia, phonophobia, dizziness, blurred vision and generalized fatigue, stenosis in carotid arteries, left subclavian artery and right common femoral artery. Collectively, these physiological conditions required the services of numerous primary care physicians and their subordinates (*e.g.*, nurse practitioner's, physician's assistants, physical therapists), orthopedic surgeons, and neurologists. Swan was subjected to numerous radiological, magnetic resonance imaging and invasive diagnostic examinations. She underwent numerous surgeries, including both knees, both shoulders, carotid arteries, *etc.*). She received facet block injections and took prescription medications, including Oxycodone, to relieve pain. She participated in physical therapy and wore a prescribed brace. A more detailed, but still very condensed, summary is provided in the lengthy note below.[3]

---

[3] Major aspects of Swan's medical issues and treatment were:

*Knees*

While in her mid-twenties, Swan had arthroscopy of her knee, which was performed by orthopedist Dr. David Van Eenenaam. (T. 295-97). Ten years later, in 2002, Swan suffered pain and a limited range of motion in her knee, which improved with conservative treatment from Dr. Van Eenenaam. (*Id.*). In 2008, due to pain in both her back and knees, magnetic resonance imaging ("MRI") was performed, which demonstrated complex tears in both of her knees (T. 510-11, 1040-41). She underwent a partial right knee medial meniscectomy surgery with Dr. Van Eenenaam. (T. 1244-49).

*Shoulders*

In summer, 2007, Swan complained to her treating physician, Dr. Rebecca Tan-Alberto, of pain radiating down from her right shoulder to her elbow and had limited range of motion. Results from MRI of her shoulder showed joint changes and a partial tendon tear; hence, in 2008, she underwent right shoulder decompression and rotator cuff surgery. (T. 299, 307, 458). In 2009, Swan underwent left shoulder decompression surgery, which improved her condition. (T. 1250-55).

(continued...)

In 2008, at the time of filing her application, Swan lived with her daughter and long-term boyfriend of 14 years. (T. 333). She smoked 1-1½ packages of cigarettes a day, and had a history of arrests for drinking while intoxicated. (T. 333). Her alcoholism, however, was in remission. (T. 12, 231).

### III. Claim and Procedural History

In April, 2008, at age 40, Swan applied for supplemental security income alleging disability beginning on September 8, 2007, due to "mini strokes,

---

[3](...continued)

*Neck and Back*

An August 2007 radiology report confirmed moderate narrowing and subchondral sclerosis with spurring at C5-6. (T. 1038). Degenerative changes were noted to have "slightly worsened" since a prior study in November 2005, with increased neuroforaminal narrowing at C5-6. (T. 1038). In 2008, she complained of lower back and joint pain and on examination demonstrated tenderness and a diminished range of motion. (T. 462-63). MRI confirmed moderate facet hypertrophy at L5-S1; mild to moderate facet hypertrophy bilaterally at L4-5; and mild diffuse bulging at L2-3. (T. 512). On subsequent visits, examination confirmed tenderness of her cervical spine and diminished range of motion. (T. 439, 443). She received facet block injection and Oxycodone to help with her pain. (T. 361, 362). She also participated in physical therapy. (T. 55-63). In 2009, Swan continued to suffer from chronic neck pain, radiating down her arms along with chronic lower back and radicular pain. (T. 426). Her cervical and lumbar spine showed diminished range of motion. (T. 427). Swan's examinations revealed positive straight leg raising bilaterally, numbness in her arms and legs, and diminished range or motion. (T. 411, 414, 416, 422). In 2010, lumbar spine MRI revealed mild and broad based disc bulges and moderate degenerative changes that had "progressed slightly" since her prior MRI. (T. 1224). A March 2011, a cervical MRI confirmed disc bulging, with minimal and moderate-level thecal sac effacement and narrowing of the neuroformina. (T. 1042).

*Wrist*

In 2009, Swan complained of right wrist pain; she underwent a nerve conduction study, which revealed mild right median neuropathy and she was prescribed wrist support to wear at night. (T. 531). Swan continued treatment for carpal tunnel syndrome with Dr. Jocelyn Beane, M.D., including status post carpal tunnel release surgery in 2010. (T. 991-1020, 1084-1102).

*Other Maladies*

Swan also followed with and was treated regularly at North Country Neurology for ongoing headaches with nausea, photophobia, phonophobia, dizziness, blurred vision, and generalized fatigue. (T. 969-87, 1106-1116). In 2012, a carotid ultrasound examination showed stenosis in her carotid arteries; thus she underwent ultrasound-guided cannulation of her right common femoral artery, arch aortography with cervicocerebral angiography, and selective catherization of her left subclavian artery. (T. 959, 966). A month later, she underwent a left carotid to subclavian bypass with a Dacron graft. (T. 942).

arthritis, lower back pain, knees messed up, headaches, surgery on right shoulder, need surgery on left shoulder, bulging disc in neck." (T. 138). After her claim was denied initially, she requested and received an evidentiary hearing before administrative law judge John P. Ramos ("ALJ Ramos") in November 2009. (T. 23-44). Swan, represented by counsel, participated telephonically and testified. (*Id*.). ALJ Ramos also received into evidence Swan's medical treatment records and forensic reports from treating sources and a consultative internal medicine examiner, Brij Sinha, M.D. (*Id*.).

ALJ Ramos denied Swan's application in a written decision dated January 5, 2010. (T. 10-18). When the Appeals Council denied her request for review (T. 1-5), Swan filed an action for judicial review. The court concluded that ALJ Ramos erred in failing to complete an "extra weight" analysis of a treating physician's forensic opinions, and remanded the case to the Commissioner of Social Security for reconsideration of that physician's conclusions. (T. 686-99).[4]

While the Appeals Council and this court were considering Swan's requests for administrative and judicial review (as described above), Swan filed a second administrative claim in May, 2011. Therein, she asserted the same grounds for disability, but with additional limitations (carpal tunnel in both hands) (T. 863), and alleged the same onset-of-disability date (September 8, 2007). (T. 847). After that claim was denied initially, it was assigned to a different administrative law judge, John Lischak (ALJ Lischak).

ALJ Lischak received into evidence Swan's medical treatment records and and forensic reports from treating sources, a consultative internal medicine examiner, George Sirotenko, D.O., and a nonexamining orthopedic consultant Sury Putcha, M.D., who reviewed Swan's longitudinal medical record. (T. 612).

---

[4] *See Swan v. Comm'r of Soc. Sec.*, No. 7:10cv1334 (GTS) (N.D.N.Y. Sept. 12, 2012) (Memorandum-Decision and Order).

ALJ Lischak then conducted an evidentiary hearing on August 20, 2012. (T. 603-43).

Swan testified. (T. 611-43). A vocational expert was present, but provided only minimal testimony because Swan had no history of full-time past relevant work, and the record existing at that time contained no current physical residual functional capacity assessment from Swan's treating physician or any other medical source. (T. 609, 616-17, 873-74).

ALJ Lischak left the record open so that Swan's representative could obtain a current assessment of Swan's vocational abilities. (T. 642-43). Swan obtained on August 23, 2012, a medical assessment of her physical ability to do work related activities from Kathy Der, FNP. (T. 927-34). Swan also submitted a November 19, 2009, medical assessment of her physical ability to do work related activities from her treating physician Dr. Rebecca Tan-Alberton, M.D. (T. 935-41). After receiving these post-hearing exhibits, ALJ Lischak sent a computer disc containing the evidence of record (from the subsequent case only) to a vocational expert to review. (T. 867). ALJ Lischak also submitted interrogatories regarding Swan's vocational capacity for the expert to answer.[5] (T. 863-66, 867-71).

Before ALJ Lischak issued a decision, the Appeals Council reassigned the original claim to ALJ Ramos, and, on September 28, 2012, directed him to consolidate Swan's subsequent claim (pending before ALJ Lischak) with the initial claim, and issue a new decision. (T. 702). The two pending parallel claims thus merged into a single proceeding before ALJ Ramos.

---

[5] Among those interrogatories, there was a hypothetical question containing functional limitations (*e.g.*, requirement to lie down for 2 hours in an 8-hour workday, inability to lift or carry any weight, and extensive sit, stand, walk restrictions) opined by Swan's treating sources, Dr. Tan-Alberto and nurse practitioner Der. (T. 927-34, 935-41). The vocational expert responded that a person with such limitations would be precluded from engaging in any form of substantial gainful employment. (T. 864-65).

ALJ Ramos conducted another evidentiary hearing (the third overall) on January 17, 2013. (T. 644-58). That hearing was brief, lasting only seventeen minutes.⁶ Swan, represented by counsel, participated telephonically and testified. (T. 644-58). ALJ Ramos received into the evidence all exhibits of record pertaining to Swan's original and subsequent applications, including original and updated medical treatment records, original and updated forensic reports from state agency consultants, and original and updated forensic reports from treating sources. (T. 656).

## IV. Commissioner's Decision

ALJ Ramos applied a five-step sequential evaluation procedure prescribed by regulation.⁷ At Step 1, he found that Swan had not engaged in substantial gainful activity since April 2, 2008 – the date she applied for benefits. (T. 562). ALJ Ramos found at Step 2 that Swan has severe impairments consisting of "alcohol abuse in remission, degenerative disc disease of the cervical and lumbar spine, degenerative joint disease of bilateral knees, degenerative joint disease of bilateral shoulders, and mild median neuropathy of the right wrist." (*Id.*).⁸

---

⁶ ALJ Ramos commented that he did not see that there was any further development necessary since ALJ Lischak conducted a hearing and updated the medical and other evidence in August 2012. (T. 648). Swan's representative confirmed that nothing new or significant occurred after that date. (*Id.*).

⁷ *See* 20 C.F.R. § 416.920. This procedure is a fair and just way to determine disability applications in conformity with the Social Security Act. *See Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler v. Campbell*, 461 U.S. 458, 461 (1983)). A full discussion of the Commissioner's five-step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

⁸ ALJ Ramos found the following alleged impairments nonsevere: palpitations, allergic rhinitis, tobacco use, sinusitis, headaches, dermatitis, acid reflux, status post 2010 right-sided carpal tunnel release, Raynaud's disease, hypertension, hyperlipidemia, and a left subclavian occlusion." (T. 564-65). Swan does not quarrel with this finding.

At Step 3, ALJ Ramos found that none of Swan's impairments is so severe as to be presumptively disabling under the Commissioner's "Listings."[9] (T. 565-66). ALJ Ramos considered whether Swan's impairments met the criteria for Listing 1.02 (major dysfunction of a joint), Listing 1.04 (disorders of the spine), and Listing 12.09 (substance addiction disorders). (*Id*.).

ALR Ramos next assessed Swan's "residual functional capacity,"[10] and found that, despite her severe impairments, Swan can still perform a range of work at the light exertional level, with certain nonexertional (postural) limitations. (T. 566). ALJ Ramos's full residual functional capacity finding is stated verbatim in the note below.[11]

ALJ Ramos found at Step 4 that Swan had no past relevant work, noting that at age forty-four, she had not worked at a substantial-gainful-activity level in the past twenty-five years. (T. 571). Thus, ALJ Ramos proceeded to Step 5

---

[9] *See* full description of "Listings" in Section VI, *infra*.

[10] This term of art refers to what claimants can still do in work settings despite physical and/or mental *limitations caused by their impairments and any related symptoms, such as pain. See* 20 C.F.R. § 416.945. Administrative law judges thus decide whether applicants, notwithstanding their severe impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis. *See* SSR 96-8p, TITLE II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 61 Fed. Reg. 34474, 1996 WL 374184, at *4 (SSA July 2, 1996).

[11] ALJ Ramos articulated Swan's residual functional capacity as follows:

```
The claimant has the residual functional capacity to perform light
work as defined in 20 CFR 416.967(b), because she is able to lift
and/or carry twenty pounds occasionally and ten pounds frequently,
stand and/or walk for six hours in an eight-hour workday, and sit
for six hours in an eight-hour workday.  The claimant is able to
occasionally climb ramps and stairs, balance, stoop, kneel, crouch,
and crawl.  In addition, the claimant can do no repetitive (more
than occasional) arm motions involving overhead reaching and the
claimant should avoid working at unprotected heights and climbing
ropes, scaffolding, and ladders.
```

(T. 566).

of sequential analysis where the evidentiary burden shifted to the Commissioner to produce evidence that an alternative job existed which Swan could perform based on her age, education and residual functional capacity.[12] (T. 572).

ALJ Ramos determined that Swan can engage in alternative, available work. (T. 572). As evidence thereof, he consulted and relied upon Medical–Vocational Guidelines commonly referred to as "the grids."[13] (*Id.*). He acknowledged that the grids do not account for nonexertional limitations, but found that Swan's nonexertional limitations have little or no effect on her occupational base of unskilled light work. (*Id.*). He based this latter finding on Social Security Ruling 85-15, which contains administrative findings regarding the erosive effect of certain nonexertional limitations on the occupational base for light and sedentary occupations.[14] Thus, a conclusion of "not disabled" was appropriate under the framework of Rule 202.20. (*Id.*).

Swan's application was denied. (T. 572). The Appeals Council denied Swan's request to review. (T. 544-47). Swan then instituted this her second action for judicial review.

---

[12] *See Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (quoting *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)); *see also* 20 C.F.R. § 416.960(c).

[13] The Medical Vocational Guidelines are a matrix of general findings established by rule as to whether work exists in the national economy that a person can perform. When properly applied, they ultimately yield a decision of "disabled" or "not disabled." *Zorilla v. Chater*, 915 F. Supp. 662, 667 & n. 2 (S.D.N.Y. 1996).

[14] *See* SSR 85–15, TITLES II AND XVI: CAPABILITY TO DO OTHER WORK—THE MEDICAL–VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL IMPAIRMENTS, 1985 WL 56857 (SSA 1985). For example, SSR 85-15 states ""where a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work." *Id.*, at *6.

## V. Points of Alleged Error

Swan's brief articulates the following five points of error:

1. The Commissioner erroneously failed to find that plaintiff's neck impairment meets listing 1.04(a), and that she is therefore entitled to a conclusive finding that she is disabled within the meaning of the regulations;

2. The Commissioner erroneously failed to apply the proper standards for evaluating the medical conclusions of plaintiff's treating providers;

3. The Commissioner failed to properly calculate plaintiff's residual functional capacity;

4. The Commissioner failed to properly assess plaintiff's subjective allegations of pain and disabling symptoms; and

5. The substantial evidence of record does not support the Commissioner's conclusion that there is significant work in the national economy that plaintiff could perform.

(Dkt. No. 16). These essentially mirror the points proffered in the first action for judicial review (*see* note 4, *supra*). Swan's supporting arguments, however, are supplemented appropriately to reflect intervening circumstances and updated medical evidence.

## VI. Point 1 (Alleged Listings Error)

Swan argues that ALJ Ramos erred when finding that her neck impairment ( degenerative disc disease of the cervical and lumbar spine) does not meet or medically or functionally equal Listing 1.04A.

*A.* *"The Listings"*

The Commissioner's regulations list certain impairments, any of which is sufficient at Step 3 to create an irrebuttable presumption of disability. *DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998); *Dixon v. Shalala*, 54

F.3d 1019, 1022 (2d Cir. 1995); *see also* 20 C.F.R. § 416.920(a)(4)(iii) ("If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled."). When an individual has an impairment equal to a listed impairment, that individual is disabled regardless of his or her age, education, or work experience. *DeChirico*, 134 F.3d at 1180.

Claimants must present medical findings which show that their impairments match a listing or are equal in severity to a listed impairment. *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (citing 20 C.F.R. § 416.926(a) (1989) (a claimant's impairment is "equivalent" to a listed impairment "if the medical findings are at least equal in severity" to the medical criteria for "the listed impairment most like [the claimant's] impairment"))). To demonstrate that an impairment matches a Listing, claimants must show that their impairment(s) meet all of the specified criteria. *Id.*, at 530; *see also* 20 C.F.R. § 416.925(d). If a claimant's impairment "manifests only some of those criteria, no matter how severely," the impairment does not qualify. *Sullivan*, 493 U.S. at 530.

## B. Listing 1.04A

Listing 1.04 requires threshold evidence of a "[d]isorder of the spine (*e.g.,* herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture) resulting in compromise of the nerve root ... or the spinal cord." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. Listing 1.04A additionally requires "[e]vidence of nerve root compression characterized by (1) neuroanatomic distribution of pain, (2) limitation of motion of the spine, and (3) motor loss (atrophy with associated

muscle weakness or muscle weakness) accompanied by sensory or reflex loss ...."
*Id.*, at § 1.04A (numbering not in original).[15]

C. *ALJ Ramos's Findings*

ALJ Ramos's analysis of Listing 1.04A with respect to Swan's neck impairment consisted of two terse sentences:

> Objective medical evidence shows degenerative disc disease of the cervical . . . spine, however, there is *no evidence* of nerve root compression with sensory and reflex loss . . . . Thus, Listing 1.04 is not met (*Exhibit 6A, pages 10-12*).

(T. 566, emphasis added). "Exhibit 6A" to which ALJ Ramos referred was this court's 2012 Memorandum-Decision and Order (cited in note 4, *supra*) wherein ALJ Ramos's original finding that Swan did not have a neck impairment meeting or medically-equaling Listing 1.04A was affirmed. (T. 694).

D. *Swan's Challenge*

Swan acknowledges that this court's earlier Memorandum-Decision and Order held that she did not demonstrate muscle atrophy or weakness and range-of-motion limitations necessary to meet or equal requirements of Listing 1.04A. (T. 692-94). Swan argues, however, that new evidence generated after

---

[15] Listing 1.04A provides as follows:

```
1.04 Disorders of the spine (e.g., herniated nucleus pulposus,
spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative
disc disease, facet arthritis, vertebral fracture), resulting in
compromise of a nerve root (including the cauda equina) or the
spinal cord. With:

A.  Evidence  of  nerve  root  compression  characterized  by
neuro-anatomic distribution of pain, limitation of motion of the
spine, motor loss (atrophy with associated muscle weakness or muscle
weakness) accompanied by sensory or reflex loss and, if there is
involvement of the lower back, positive straight-leg raising test
(sitting and supine);
```

the earlier proceeding clearly confirms and establishes greater range-of-motion limitations and muscle weakness than were in the record when ALJ Ramos made his initial determination and this court issued its earlier remand. (Dkt. No. 16, p.12).

Swan's brief cites record evidence which, if accepted, would demonstrate all elements of Listing 1.04A, *i.e.*, compromise of a nerve root, neuro-anatomic distribution of pain, limitation of motion of the spine, and muscle weakness accompanied by sensory or reflex loss. (Dkt. No. 16, pp. 12-14). With respect to three of the four Listing elements, Swan cites new (updated) evidence, as well as original evidence.[16] (*Id.*).

## E. *Discussion and Analysis*

ALJ Ramos clearly misspoke when stating that Swan presented "no evidence" of nerve root compression with sensory and reflex loss. Swan's current brief identifies both original and updated evidence to that effect (Dkt. No. 16, pp.

---

[16] Swan does not cite new evidence regarding compromise of a nerve root. (Doc. No. 16, pp. 12-13). Swan continues to rely on her September, 2007, cervical spine magnetic resonance imaging (MRI) test showing right-sided and left-sided neural foraminal narrowing, with crowding of the thecal sac in C5-6. (T. 304, 337, 516).

In the earlier judicial-review action, the court found it unnecessary to decide whether crowding of the thecal sac demonstrates a sufficient compromise of the nerve root under Listing 1.04A. (T. 693). Several courts, however, observe that such evidence shows nerve root compression. *See Ryan v. Astrue*, 5 F. Supp.3d 493, 508 n.13 (S.D.N.Y. Mar. 18, 2014)("[T]he record reflects diagnosis from plaintiff's treating sources of . . .disk herniations at L5-S1 and L4-L5 levels impinging on the thecal sac, which can cause nerve damage and pain); *Norman v. Astrue*, 912 F. Supp.2d 33, 79 (S.D.N.Y. Sep. 25, 2012)(with respect to evidence of nerve root compression . . .L4-5 left ligamentum flavum hypertrophy with mild postero lateral thecal sac narrowing of the lumbar spine); *Valet v. Astrue*, No. 10-CV-3282 (KAM), 2012 WL 194970, at *14 (E.D.N.Y. Jan. 23, 2012) (MRI of plaintiff's lumbosacral spine showed disc degeneration, bulging, and herniation encroaching on the right neural foramen with impression on the thecal sac; these changes, along with plaintiff's repeated complaints of "radiating" pain down her left arm and leg . . .appear to constitute "evidence of nerve root compression. . . . ").

12-14), and the Commissioner's brief concedes that Swan produced some evidence showing that medical criteria of Listing 1.04A were met from time to time. (Dkt. No. 17, p. 8).

In the earlier action for judicial review, moreover, this court did not conclude that there was a complete *lack* of evidence supporting Swan's claim. It simply noted that there was *other* substantial evidence supporting ALJ Ramos's Step 3 finding. In any event, the court's earlier observation pertained to muscle atrophy and weakness and limited range of motion, not nerve root compression with sensory and reflex loss.

More problematic is ALJ Ramos's conclusory Step 3 finding and citation only to this court's *prior* Memorandum-Decision as evidentiary support for his *current* Step 3 finding regarding Listing 1.04A. There is no reference to, analysis or weighing of any new evidence adduced and made part of the subsequent claim file while it was still assigned to ALJ Lischak. This omission and ALJ Ramos's specific citation to the court's earlier decision compel a logical inference that ALJ Ramos considered the Step 3 issue to have been finally adjudicated in the original judicial review action so that further consideration by him was foreclosed.

That supposition might have been warranted had the evidentiary record remained static between ALJ Ramos's first and second decisions, or if the issue were confined to Swan's condition as of January 5, 2010 (date of ALJ Ramos's first decision). The Appeals Council, however, directed ALJ Ramos also to consider Swan's second application that related to a later time. (T. 702). And, as Swan's brief emphasizes, additional Listings-related evidence was developed during the interim. (Dkt. No. 16, pp. 6-10, 12-13). Failure to consider and weigh

it deprived Swan of her due process right to have a decision based on all of the evidence in a fully-developed record. *See Twyne ex rel. Johnson v. Barnhart*, No. 01 Civ. 2264, 2003 WL 22299198, *12 (S.D.N.Y. Oct. 7, 2003) (when making a disability determination, an administrative law judge must consider all of the relevant evidence in the record) (internal quotations and citations omitted).

While administrative law judges are not required to specifically mention and discuss every piece of evidence, they are not excused from addressing key determinative issues with sufficient specificity. *See Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *see also Davis v. Astrue*, No. 6:09–CV–186 (LEK/GHL), 2010 WL 2545961, at *3 (N.D.N.Y. June 3, 2010). The Second Circuit explicitly requires them to set forth their decisions in such a manner so as to "enable [reviewing courts] to decide whether the determination is supported by substantial evidence." *Davis*, 2010 WL 2545961, at *3; *accord Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (administrative law judge's failure to explain or even address his implicit rejection of conflicting probative evidence was error; boilerplate language was insufficient to allow a reviewing court to adequately review the ALJ's decision).

When an administrative law judges find that claimants have not met their Step 3 evidentiary burden, they generally must "set forth a sufficient rationale in support of [their] decision to find or not to find a listed impairment." *Berry*, 675 F.2d 469. It is particularly important to specifically address conflicting probative evidence with respect to a Step 3 finding because a claimant whose condition meets or equals that of a Listing is deemed disabled *per se* and eligible to receive benefits. *See* 20 C.F.R. §§ 416.920(d), 416.925, 416.926. It is well-settled that "[w]here the claimant's symptoms as described by medical evidence

appear to match those described in the Listings, the ALJ must explain a finding of ineligibility based on the Listings." *Kovacevic v. Chater*, No. 94–CV–600S, 1995 WL 866425, at *8 (W.D.N.Y. Sept. 28, 1995) (citations omitted); *see also Kerr v. Astrue*, No. 09–CV–01119 (GLS), 2010 WL 3907121, at *3–5 (N.D.N.Y. Sept. 7, 2010); *Davis*, 2010 WL 2545961, at *3–5. Thus, when there is significant probative evidence that a claimant meets the criteria for a Listing at Step 3, the case will be remanded if the court determines that the "[p]laintiff was owed a more substantive discussion of why she did not meet [a particular Listing]." *Kerr*, 2010 WL 3907121, at *6 (citations omitted).[17]

Absence of a plausible rationale also is important in cases where a reviewing court is "unable to fathom the ALJ's rationale in relation to evidence in the record." *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (internal quotation marks omitted. In such cases, courts generally do "not hesitate to remand the case for further findings or a clearer explanation for the decision." *Berry*, 675 F. 2d at 469.[18]

## F. Harmless Error Analysis

The error identified above was not harmless. ALJ Ramos's failure to consider and weigh new evidence, and his failure to resolve evidentiary conflicts in the record as a whole in such a way as to permit meaningful judicial review

---

[17] *See also Morgan o/b/o Morgan v. Chater*, 913 F. Supp. 184, 188-189 (W.D.N.Y. 1996) (holding that a one-sentence denial is insufficient to support the determination, especially in light of the considerable evidence to the contrary).

[18] When a court is "able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence," reversal and remand may not be necessary. *Berry*, 675 F.2d at 469; *see also Salmini v. Commissioner of Soc. Sec.*, 371 Fed. App'x 109, 112-13 (2d Cir. 2010) (summary order); *Otts v. Commissioner of Soc. Sec.*, 249 Fed. App'x 887, 889 (2d Cir. 2007) (summary order).

of his credibility choices deprived Swan of substantial rights to an administrative decision based on all relevant evidence and to a decision susceptible to judicial review.

The Commissioner argues that while "the medical criteria of Listing 1.04A may have been met from time to time, all of the required elements [of] the Listing were not consistently present throughout the period at issue. . . . Therefore it is Plaintiff who has not carried her burden . . . ."[19] (Dkt. No. 17, p. 8). This argument implies that ALJ Ramos inevitably would have come to the same conclusion had he assessed the Listing-related evidence developed after his initial decision and the court's earlier order remanding the case.

ALJ Ramos might reasonably have come to the same decision had he factored all of the Listing 1.04A evidence into his decision. The new evidence obtained by ALJ Lischak was not necessarily tectonic, nor was it entirely favorable to Swan.[20] And, as the Commissioner's brief emphasizes, the original medical evidence contained many findings and notations that Swan's neck-impairment symptoms did not always meet Listing 1.04A criteria. (Dkt. No. 17, pp. 6-8). A reviewing court, however, cannot weigh evidence *de novo*, nor can it resolve evidentiary conflicts. Thus, the Commissioner must decide whether and when old evidence becomes stale or new evidence tips the scales in a claimant's

---

[19] The Commissioner's briefing counsel cites *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990)in support of this assertion. While *Sullivan* establishes that claimants must show that their impairments meet all specified Listings criteria, it does not address the separate issue of whether the required elements of a Listing must be <u>consistently</u> present throughout the period at issue.

[20] A cervical spine MRI study in March, 2011, reconfirmed multiple disc bulges with thecal sac effacement at the C4-5, 6, C6-7 and C7-T1 levels, but disclosed no spinal cord compression. (T. 1043).

favor. The Commissioner, not a reviewing court, has the prerogative and duty to assess whether a claimant whose symptoms appear to wax and wane in the course of medical treatment can engage in substantial gainful activity on a day-to-day basis. That assessment, however, cannot be based only on isolated evidence adduced in a prior administrative proceeding but rather must be based on review of the entire longitudinal record. Consequently, a reviewing court cannot confidently conclude that the result would have been the same absent the errors described above.

G.   *Conclusion*

Swan adduced significant probative evidence that she met the medical criteria for Listing 1.04A. She was owed a more substantial discussion of why she did not meet that Listing to enable a reviewing court to adequately review that determination and decide whether it was supported by substantial evidence. The error in failing to address new and conflicting evidence was not harmless. Accordingly, remand is appropriate.

## VII.   Remaining Points

Swan's remaining points of error relate to ALJ Ramos's weighting of medical source opinions and subjective testimony, his residual functional capacity analysis, and whether expert testimony was required to determine if jobs exist in significant numbers that, factoring all of her nonexertional limitations, she could perform. These need not be addressed on their merits because (a) it is pointless to do so until it is properly determined whether Swan meets the criteria of Listing 1.04A, and (b) the outcome of this case will not change whether or not these arguments are meritorious based on the existing record.

Addressing these additional issues administratively on remand, however, may avoid another costly and lengthy action for judicial review in what already is an old case.

## VIII. Recommendation

The Commissioner's decision should be REVERSED and REMANDED pursuant to 42 U.S.C. § 405(g), sentence four, for further proceedings.

## IX. Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

> FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011) (summary order); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the  31  day of    July    2015.

*/s/ Earl S. Hines*
Earl S. Hines
United States Magistrate Judge